**UNITED STATES of America, Plaintiff,**

v.

**Michael James O'DRISCOLL,
Defendant.**

**Nos. 84–CR–14–1, 83–CR–63–1.**

United States District Court,
D. Colorado.

May 25, 1984.

Robert N. Miller, U.S. Atty., and Richard T. Spriggs, Asst. U.S. Atty., Denver, Colo., for plaintiff.

Isaac H. Kaiser, Berenbaum & Weinshienk, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

### PREFATORY STATEMENT

The responsibility for imposing condign sentence upon a defendant convicted of crime rests upon the judge who has presided over the trial in which the verdict was rendered or, in the absence of trial, who accepted the plea of guilty to the charge. In the instant proceeding, the defendant was convicted of the crime of kidnapping in a jury trial and also entered a plea of guilty to the crime of armed bank robbery. I know of no more excruciating decision for a judge to make than whether to confine and, if so, for how long and under what terms and conditions.

I am keenly aware of the imperfections of the judicial process and my own fallibility of perception when called upon to impose a final and awesome judgment. I can deal only with the defendant who stands before me and not with the society that helped to form and nurture him.[1] Whatever sentence I impose must be limited to that which is authorized by law. As best I am able, I must purge myself of any inappropriate emotions or motivations. No sentence which is imposed for the purpose of vengeance or to satisfy a public demand for vengeance is worthy of respect.

Justice consists in meting out a sentence which is threatened by law and deserved by the guilt of one who voluntarily ran the risk of conviction. It is, therefore, the responsibility of a judge to sentence not for the sake of the individual, but for the sake of justice—to carry out the threat of the law and to deter others from committing the same or similar acts. As Tolstoy observed, the seeds of every crime are in everyone of us. All of us need to be restrained from doing what may tempt us by seeing what happens to one who has in fact done it. The law's warnings must be real. The grim consequence of imprisonment must be shown to be inevitable. To do otherwise is to trivialize the seriousness of crime and depreciate the humane principles by which integrity and dignity are recognized in all of us.[2]

In furtherance of these principles and in determining the particular sentence to be imposed in this case, I have chosen to be guided by proposals presently pending before the Congress of the United States

---

1. N. Walker, *Sentencing in a Rational Society,* (New York: Basic Books, 1971).

2. *See United States v. Bergman,* 416 F.Supp. 496 (S.D.N.Y.1976).

which would require any federal judge to state in open court the reasons for the particular sentence imposed.[3] These proposals suggest that I consider the nature and circumstances of the offenses; the history and characteristics of the defendant; the need for the sentence to afford adequate deterrence to criminal conduct; the need to protect the public from further crimes of the defendant; and the need to reflect the seriousness of the offense so that the law will be respected.

## I. THE NATURE AND CIRCUMSTANCES OF THE OFFENSES

### A. The Bank Robbery

When the defendant entered the Western Federal Savings and Loan Association on December 20, 1982, he was carrying a handgun in each hand. He was accompanied by Christine Marie Blake who was also carrying a handgun. Blake maintained a relatively low profile throughout the robbery, but the defendant was very aggressive, pushing people around and making numerous demands using loud profanities. When people did not move fast enough for him, he would bang one of his guns. On one occasion, after ordering everyone down on the floor, he noticed an elderly man who had instead buried his face in his hands at the check writing counter. Defendant went over, yelled at the man and then slammed the butt of his own gun on the top of the check writing counter, smashing the glass. The bank lost $3,384 from the robbery. In addition, repairs cost approximately $250 to replace a handle on the vault, which the defendant broke; to replace the glass, which defendant smashed on top of the check writing counter; and to replace a large picture-type glass window, through which the defendant fired a shot. The fear defendant instilled in all the employees was by far the worst part.

Sheri Larson, age 24, had started working at the bank only four days before the robbery. She was five months pregnant at the time. She states:

First he grabbed me by the arm and forced me to help him take money out of the drawers. When I ran out of money and gave him some rolls of coins, he became very angry and elbowed me in the stomach. He hit me so hard it doubled me over and then he pushed me down on the floor. My doctor monitored me closely for a week because I was having a lot of pain in my stomach. For a very long time, I had nightmares and trouble sleeping and even now I sometimes get so afraid of a suspicious stranger that I have to go to another room to get control of myself. Before, I was never like that. I was afraid he would kill one of us and when he fired the shot, that possibility became even more real. But the worst part was that I never stopped worrying about the possibility of injury to my baby until he was born and I could see that everything was OK.

While leaving the bank, the defendant fired the shot through the window and threatened to kill all the bank personnel.

The defendant was identified as the perpetrator of the robbery by means of surveillance photographs taken by cameras in place during the commission of the crime. Thereafter, Christine Blake was apprehended and admitted her participation in the offense. After his arrest, the defendant likewise admitted his guilt in a signed statement given to an FBI agent in Springfield, Massachusetts.

### B. The Kidnapping[4]

During the summer and fall of 1982, the defendant was living in Denver, Colorado with a paramour by the name of Karen Tietjens. During this time he was a fugitive wanted for a number of bank robberies in the Springfield, Massachusetts vicinity.

On October 11, 1982, he purchased a yellow 1976 Dodge van from a private party, using a Colorado driver's license which he had acquired in the name of Gregory Dean Sanders. On November 12, 1982 at Mile High Pawn Shop in Denver, he pur-

---

3. First proposed in S. 1722, 96th Cong., 1st Sess., § 2003(1) and (2) and (c).

4. The facts relating to this criminal episode were all established at the trial.

chased a 9mm Model 459 Smith & Wesson automatic, likewise using the false Sanders driver's license for identification purposes. On December 16, 1982, he purchased a Smith & Wesson Model 29 .44 magnum revolver at Tyrol Sport Arms Company in Denver, using for identification another false driver's license in the name of Michael Maher.

On December 20, 1982, after the armed robbery at the Western Federal Savings and Loan Association offices in Denver, the defendant fled with Blake and Tietjens to Salt Lake City. Blake then returned to the Springfield, Massachusetts area. The defendant and Tietjens continued on to the west coast.

On January 19, 1983, Tietjens and the defendant returned to Denver, driving the 1976 Dodge van. The defendant was out of funds. He could not pay the full price for a motel room so he secured accommodations with an agreement to pay the balance the following day.

On the next day he tried to sell the 1976 van. Failing that, he went to the Lakewood Gem and Trading Post located in Lakewood, Colorado. He attempted to pawn the .44 magnum, but the proprietor, Irwin Kass, said that he did not have a pawn license and directed the defendant to other establishments. At approximately noon the defendant and Tietjens returned to the Lakewood Gem and Trading Post in the 1976 van. The defendant entered the store alone under the pretext of selling the .44 magnum. Encountering Mr. Kass alone in the store, he announced a stick-up and forced Mr. Kass to get down on his hands and knees. After obtaining about $400 from the cash box, he proceeded to pistol whip Mr. Kass with the .44 magnum. The victim sustained numerous lacerations to the scalp requiring more than 100 stitches, a blood transfusion, the capping of three broken teeth, two broken fingers, one of which has remained noticeably disfigured due to bones which were smashed beyond repair, and a severely torn ear which had to be sewn back. Mr. Kass testified that his fingers were smashed when he attempted to shield his head with his hands.

"I am sure the only reason he quit beating me was because he thought I was dead," Mr. Kass stated. He was an inpatient at St. Anthony's Hospital for one week and medically unable to return to work for 3½ months. When he was medically cleared to return to work the memories were so painfully difficult that he ran ads for two months attempting to sell the store, but was unsuccessful in finding a buyer. Mr. Kass now experiences significantly less anxiety in the store, although he still experiences some anxiety whenever suspicious strangers enter. The biggest problem he now has is getting a good night's sleep. Approximately every other night he wakes up. When he does, he cannot get back to sleep without first checking around his house to see if someone is there who might harm him. Before the beating, Mr. Kass never had trouble sleeping.

Immediately following the holdup and pistol whipping of Mr. Kass, the defendant and Tietjens fled down a busy thoroughfare to a shopping center. As they pulled into a parking space in front of a J.C. Penney store, Kent Leslie Martin, a salesman, was pulling into an adjacent parking space in his 1976 Oldsmobile sedan. The defendant got out of the van and entered Mr. Martin's car kidnapping him at gunpoint. Tietjens then entered Mr. Martin's car and the three of them departed. They returned to the motel, paid the bill and obtained their luggage with Mr. Martin still held at gunpoint. They then proceeded straight east on Interstate 70 across Colorado and into the State of Kansas.

Upon arriving at Salina, Kansas, the defendant dropped Tietjens off at a truck stop, advising her that he was going to take Mr. Martin out and tie him up. After a lapse of some five or ten minutes, he returned to the truck stop, picked Tietjens up and they proceeded together to the vicinity of Cleveland, Ohio in Mr. Martin's car. While en route, the defendant told Tietjens that he had shot Mr. Martin in order to prevent him from identifying them.

On January 23, 1983, two pheasant hunters found the frozen remains of Kent Martin. They duly reported their finding to the Saline County Sheriff's Office. Post-mortem examination established that Mr. Martin had been shot 10 times with a 9mm weapon and had died of massive bleeding secondary to multiple gunshot wounds. The pathologist described one of the 10 bullet wounds as a "contact" wound, located in approximately the center of the chest.

On January 31, 1983, the defendant, using Kent Leslie Martin's car and the 9mm Smith & Wesson, committed another armed robbery at the People's Savings Bank on South Street in Holyoke, Massachusetts. Mr. Martin's car was then abandoned in Groton, Connecticut where the police impounded it on February 8, 1983. An examination of the car revealed the right ring fingerprint of the defendant on the rear view mirror.

On September 23, 1983, officers of the Pierce County Sheriff's Office arrested the defendant in Tacoma, Washington. At the time of his arrest, he had the 9mm Smith & Wesson in his possession. Laboratory examination confirmed that this was the identical weapon which fired the five shell casings found at the scene of Mr. Martin's death. In a subsequent search of the defendant's residence near Tacoma, law enforcement officers also found the .44 magnum.

Kent Martin is survived by his wife, Terri, and a son, Shawn. Mr. and Mrs. Martin were childhood sweethearts. They grew up in the same neighborhood. At the time of his father's kidnapping, Shawn was an enlisted man in the United States Navy. As a consequence of defendant's acts, Shawn's training in nuclear power was terminated and he was granted a hardship discharge. Today, he works as a lot boy at a local auto dealership. Both Mrs. Martin and Shawn need counseling to assist them in handling their loss, but financial circumstances prevent them from doing so. Mrs.

Martin is a remarkably strong person who is determined to go on with her life—a life entirely different from the one she had enjoyed. In addition to feelings of grief, loss, anger and shock, she has had to become the head of the family. "The hardest thing," she says, "has been for us to re-establish our family and for my son to feel there is any family left to re-establish."

At the time of his death, Mr. Martin was 39 years old. He was a salesman with Weather Shield Manufacturing Company. He had recently been transferred to the Denver area and was anticipating a significant increase in income because of his transfer to the more active sales area. He was regarded as an excellent employee with a sound and promising future with his company.

The defendant admits committing the Western Savings robbery and denies committing the kidnapping. During the kidnapping trial, the defendant testified. His story was absurd and blatantly perjurious.

## II. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT [5]

The defendant was born August 6, 1953 at Springfield, Massachusetts, the second of three sons born to Francis and Theresa O'Driscoll. He spent most of his formative years in West Springfield where his father worked as a shipping clerk and his mother as a waitress. Unfortunately, his early adolescence was marked by the breakup of his parents' marriage, followed by a juvenile court commitment to a training school where, at a critical time in his life, he spent five months without the benefit of any professional staff or constructive therapeutic program. At age 18 he was diagnosed as being extremely immature. Even so, he married and became a father. He experienced stressful and disruptive events including the failure of his marriage and, more recently, the death of his mother.

**5.** 18 U.S.C. § 3577 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court ... may receive and consider for the purpose of imposing an appropriate sentence." *See United States v. Marshall,* 519 F.Supp. 751 (E.D.Wis. 1981).

In the seventh grade, the defendant became an habitual truant. In 1975 his state probation officer referred him to the Massachusetts Rehabilitation Commission. He underwent limited psychological and vocational testing, but his file was closed in 1977 because of his failure to cooperate. On February 17, 1978, while a student at the Hampden District Regional Skill Center in Springfield, Massachusetts, the defendant passed his G.E.D. test. On April 14, 1978, he received a certificate of accomplishment in welding and was hired immediately by a manufacturing concern.

Records indicate that from April, 1978 to the present date, the defendant has held a total of four jobs for a total of eighteen months. In each instance, the defendant states he was fired for trying to start a union or for "helping other people whose rights were violated by the company." Likewise, in each instance, the employer reports that he was fired for violations of rules, failure to report for work or poor work performance.

The defendant is the father of two children. Although he expresses great love for them and says that his wife was a good wife, he walked out on his family. His exhibited behavior is inconsistent with his expressed concern for this family. His financial support of them has been almost nonexistent.

After the breakup of his marriage, the defendant became involved with a woman he met in a bar. They traveled together and eventually settled in the San Diego area where they were apprehended for stealing on two occasions. A number of women presently correspond with the defendant. Not all of them know about each other nor do they know that he has discussed marriage with a number of them.

The defendant admits to having robbed seven banks but states that he has never hurt anyone in these robberies. He admits to heavy consumption of alcohol and to having tried cocaine and most other drugs except heroin. He has no assets or liabilities. During the presentence investigation process, the defendant attempted to bargain with the court. He indicated that he would provide information about the location of $98,000 which he had salted away from some of his bank robberies in exchange for a guarantee by the court that he could receive conjugal visits from some of his woman friends. When the court clearly and unequivocally declined his offer, the defendant stated that he would never tell anyone else about the location of the money.

From the age of seventeen to this date, the defendant has been convicted of at least eight misdemeanor offenses, six serious traffic violations and three or four felonies. Two of those felony convictions were for bank robbery and kidnapping on September 23, 1983. Until his sentence of twenty-five years concurrent on the last two named convictions, the defendant had spent a total of twenty days in jail serving sentences. In each instance where the defendant was convicted in the state courts of California for burglary, theft and false impersonation, he was placed on probation.

The conviction in Massachusetts requires some detailed comment:

Records of the United States District Court for the District of Massachusetts reflect that defendant, with counsel, entered pleas of guilty to Armed Bank Robbery and Kidnapping. The codefendant, Salvatore Joseph Finocchiaro, aka Robert Callahan, was sentenced May 17, 1983 to 15 years. The official version reflects that on the afternoon of November 10, 1982 the defendant and Callahan entered Park West Bank at West Springfield, Massachusetts, looked around and then left, only to reenter a few minutes later. Callahan, armed with a handgun, positioned himself at the end of the teller's line while the defendant put a handgun in the face of Teller Barbara Thompson and vaulted over the counter. He yelled for everyone to get down on the floor and pushed Ms. Thompson and another bank employee down when they did not follow his instructions quickly enough. After herding the bank employees toward an adjacent kitchen, the defendant ordered another teller to fill a bag with money from the teller's drawers. During the robbery,

the defendant kept pointing his handgun at the branch manager, demanding that he open the vault even though the branch manager had explained to him that the vault was on a time lock and would require fifteen minutes to open. After taking the money from the teller's drawers and removing money bags from the outer portion of the vault, which was not locked, the defendant walked into the lobby area of the bank and yelled at Callahan, "Do you have the bomb?" Callahan then placed a cardboard box on the customer's counter and the defendant told everyone in the bank that the bomb would go off if anyone moved.

The defendant and Callahan left the vicinity of the bank driving a 1971 Plymouth, which collided with an automobile owned by Dwight Bradley. Mr. Bradley began to pursue them, but retreated when the defendant turned toward him, pointed his handgun and said, "I've got a gun; don't come near me or I'll blow your head off." The defendant and Callahan then ran around an apartment building and fled from there in a 1974 Nova which they had previously arranged for and proceeded north toward Holyoke, Massachusetts.

In Holyoke, they approached Ms. Ida Kraft, sixty-six years of age, in a shopping center. She was ordered to move her car. When she did not comply quickly enough, the defendant punched her in the face and pushed her into the car. As he got behind the wheel, Callahan got into the front seat next to her and kicked her in the right leg. She recalls that both men were armed with handguns and that the defendant told her he would shoot her and put her in the trunk. During the course of their ride, the defendant said they were being chased by the Mafia. In the early evening of November 10, 1982, they arrived in the Albany suburb of Colonie, New York, where they rented the end room of a motel. Using rope cut from the blinds, the defendant and Callahan tied Mrs. Kraft to the bed and the defendant told her that his babysitter would come and release her. He warned her that she would be killed if she went to the police. Within half an hour of their

departure, Mrs. Kraft released herself and went to the motel office.

The defendant and Callahan drove to the Albany airport, where they purchased tickets using aliases for a flight to Chicago, Illinois. Alerted that they were flying to Chicago, law enforcement officers in that city were waiting at the airport when their flight arrived at 8:45 p.m. Callahan was taken into custody as he disembarked from the plane, but the defendant eluded apprehension.

When questioned by FBI agents, Callahan stated that the bank robbery and kidnapping were the defendant's idea and told police where they could find the .45 caliber and .25 caliber handguns which they used. Both guns were recovered. Using a search warrant for a suitcase in Callahan's possession at the time of his arrest, The FBI recovered $15,027.82. An audit at the Park West bank revealed that $29,622 was taken in the robbery, leaving $14,594.18 unrecovered. The bomb device used in the bank robbery was a hoax, consisting of a lump of clay with various wires and transistors set into it.

At the time of defendant's arrest September 23, 1983 at Tacoma, Washington, the nine-millimeter Smith & Wesson pistol taken from him was loaded with rounds of silver-tipped hollow point ammunition. The subsequent search of his residence uncovered a large number of handguns, rifles, and a sawed-off shotgun.

The Victim Impact Statement reflects that Mrs. Kraft is a 67-year-old widow who lives alone. She was treated in the emergency room of an Albany hospital for "tenderness, pain, swelling and ecchymosis of the face and left eye from having been struck in the face with a fist or a gun." She was also treated for "pain throughout her upper body and swelling of her lower right leg." Mrs. Kraft has been extremely nervous. She is constantly in fear of retaliation for her statement regarding the abduction and has not returned to her normal state of well-being. Her physician remarked that before the abduction he "had not seen her since 1974, since she was in

good health," and that she previously did not experience anxiety or apprehension such as what she was experiencing after being victimized. As of December 1983, Mrs. Kraft had only limited disabilities and had essentially recovered from the physical ailments that resulted from the abduction, but still has occasional pains, intermittent depression and nausea.

For Mrs. Kraft the ordeal of her abduction was a harrowing experience. She said that both abductors kept their firearms visible to her throughout the ride through Massachusetts, Vermont and New York. Both smoked marihuana during the trip. She estimates that at times the automobile reached speeds of 90 miles per hour. Throughout the trip, she feared for her life, but recalls the most frightening part of the trip was when they were outside of Albany, New York. Both men got out of the car and conversed behind it. During that time, she thought they were discussing whether to kill her. She also felt in extreme danger when left in the motel room tied to the bed. While there, she rubbed her two index fingers raw in an effort to loosen the rope because she was afraid someone would return to the room and kill her.

In addition, the bank robbery had a significant emotional impact on the bank manager. He became so depressed and withdrawn from people, including his wife, that he was forced to take a three-week leave of absence and undergo psychiatric treatment for several months. Only one of the three tellers on duty is still with the bank. That teller complains of difficulty sleeping and is still overly suspicious of some customers.

\*　　\*　　\*

At the present time the defendant has seventy one charges in seven different courts pending against him. These charges include assault on a federal officer, escape, murder, assault with dangerous weapons, armed robbery, malicious injury, assault with intent to rape and threat to murder. In addition, there are eight pending charges of kidnapping.

## III. SUMMARY

The danger which this defendant represents to the public, to law enforcement and prison officials and to other inmates cannot be exaggerated. It is not so much the crimes of violence which signal extreme danger as it is the total abandon with which the defendant commits them. Not content to leave the store of Mr. Kass with his ill-gotten gains, the defendant first had to order Mr. Kass to his hands and knees for a terrible pistol whipping about his head and face. That Mr. Kass did not suffer permanent brain damage or even death is of no credit to the defendant. Not content with taking Kent Martin's car, he had to kidnap him as well. Then, as the evidence clearly showed, the defendant executed Kent Martin in a most cowardly fashion and, most tragically, for no intelligent reason at all.

Even the defendant's bank robbery is infused with viciousness. It is not his planned criminality but rather his random mindlessness which make his crimes worse than most. In sharp contrast to many bank robbers who calmly and quietly expose a weapon and convey a sense of restraint and control, this defendant barged into the bank waving a firearm in each hand, angrily ordering people about with shrieking profanity and terrorizing the aged and others who were obviously unable to resist. He sharply elbowed a woman who was five months pregnant with such force that she doubled over. Although impatient with others, he found time to use the butt of his gun to smash the glass top of a table which was supporting an old man.

It is difficult, indeed impossible, to describe accurately the physical and emotional suffering and loss which this defendant has caused to so many, yet he demonstrates not even a scintilla of remorse. Instead, he is preoccupied with the immediate gratification of his own needs. He appears uncommonly successful in manipulating a number of women and exploiting them in ways that not only injure their lives, but also create significant problems with the

security measures necessary to control and monitor him.

The evidence is clear, convincing and beyond serious disputation that the defendant has a chronic sociopathic personality. The term "sociopath" no longer enjoys popularity with mental health professionals who are imbued with an excessively behaviorist orientation, but it still holds fast for those of us who are trying to describe one who exists as if he were in a moral vacuum, knowing right from wrong yet totally unaffected by that knowledge. In other words, the defendant fails to demonstrate even the existence of a conscience. Results of psychometric testing show that he is chronically maladjusted, immature and self-indulgent, manipulative of others, obnoxious, hostile and aggressive. He is incapable of respecting authority, demonstrates difficulty in interpersonal relations and refuses to accept responsibility for problems. He is hedonistic and overuses alcohol and drugs. He is excessively impulsive and acts out against others without considering the consequences. His capacity for rage has already been more than adequately demonstrated. In his wake he has left nothing but carnage and devastation.

Any leniency in sentencing in this case would depreciate the seriousness of the defendant's crimes and would promote a clearly understandable disrespect for the law and the judicial system. Further, I consider it mandatory to impress upon all who learn of this defendant's sordid criminality what certain and terrible penalties would be imposed upon them for similar conduct. This defendant has demonstrated himself to be such a danger to the public that I believe it is incumbent upon me to do all that I can to see that he is never again let loose to wreak violence and devastation upon the innocent, the weak and the aged.

I have considered the appropriateness of providing the defendant with training, medical and psychiatric treatment or other correctional treatment with the hope that his rehabilitation might be realized. It is indeed unfortunate that his early adolescence was marked by the painful disruption of his family life and that he was committed to an institution which did not have adequate funding to provide necessary staff and programs to help him when help would most probably have done some good. Nevertheless, the stressful and disruptive events in his young life fall far short of explaining or mitigating the magnitude of his violent criminal behavior. It is devastating to say, but this defendant's record establishes that it is simply too late to indulge in quixotic notions of rehabilitation and redemption.

The maximum penalty for armed bank robbery is imprisonment for not more than twenty-five years and a fine of not more than $10,000 or both such fine and imprisonment. The defendant has already been sentenced to twenty-five years imprisonment for a similar offense and I do not perceive any reason to impose a lesser sentence in this case.

The penalty for the crime of kidnapping is any term of years or for life. Upon first impression, it would seem reasonable to impose a sentence of life imprisonment in this case. Upon reflection, however, I have decided to impose a term of years. My decision is based upon the provisions of law set forth by Congress in the United States Code. Title 18 of the United States Code, Section 4205 provides that whenever a prisoner is serving more than one year in prison, he or she becomes eligible for release on parole after serving one-third of the sentence or sentences imposed by the courts. If a life sentence is imposed, or if the total of sentences imposed exceeds thirty years, then the defendant becomes eligible for release on parole after serving ten years.

I do not know what some parole authority in the future might be disposed to do with this defendant, but even the possibility of this defendant obtaining release in ten or so years reduces the seriousness of his crimes to the point of triviality. Accordingly, I have found authorization for an appropriate sentence in subparagraph (b) of Section 4205 which reads as follows:

Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the

ends of justice and *the best interest of the public* require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

(Emphasis added.) It is my clear intent to sentence this defendant in accordance with this statute. I have reviewed the legislative history, which is scant, and find that the sentence I shall announce is not in conflict with congressional purpose.[6]

I specifically find the ends of justice and the best interest of the public require that this defendant be sentenced to imprisonment for a *term exceeding one year* and that I should designate in the sentence a minimum term at the expiration of which the defendant shall become eligible for parole which is less than one-third of the maximum. It should be clear to all who review this sentence that my intent is to announce that this defendant will not be released from prison at any time insofar as it is within the power of the judicial branch of the government to prevent such a release. In the unlikely event that this defendant ever becomes deserving of release in full appreciation of the wrong he has done and awareness of the danger to others he presents, the laws of the United States provide for action by the executive branch of government.[7] In other words, his release, if ever, should be a matter of executive clemency and not legal entitlement.

Accordingly, I pronounce the following sentence:

Michael James O'Driscoll, on the charge of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d), 2., I sentence you to the custody of the Attorney General of the United States for a term of twenty-five (25) years. This sentence shall be consecutive to the two concurrent 25 year sentences imposed December 29, 1983 by the United States District Court for the District of Massachusetts in Case No. 82–305–01. It is my specific recommendation that this sentence never run concurrently with any sentence imposed by any state court.[8]

In case number 84–CR–14–1 charging you with the crime of kidnapping, I sentence you to the custody of the Attorney General of the United States of America for a term of three-hundred years. I specifically order that this sentence shall run consecutive to and not concurrent with the sentence of 25 years imposed in case number 83–CR–63–1 charging you with armed bank robbery. Further, in accordance with 18 U.S.C. § 4205(b)(1), I specifically order that you shall become eligible for release on parole only on completion of serving ninety-nine years which is one year less than one-third of the maximum sentence of three-hundred years.

Since you have been found guilty of the crime of kidnapping by a jury, I hereby advise you that you have the right to appeal your conviction to the United States Court of Appeals and that your notice of such an appeal must be filed within ten days of today's date.

On January 5, 1984, this defendant and another federal prisoner were being transported via automobile by two U.S. Marshals. Both prisoners were in handcuffs attached to waist chains, and both were in leg irons, seated in the rear of the vehicle. Despite these precautions, the U.S. Marshal Service reports that at approximately 2:25 p.m., both prisoners let out a scream. Then, this defendant lunged over the front seat and attempted forcibly to remove the

6. S.Rep. No. 94–369, 94th Cong. 2d Sess. 23 (1976) *reprinted in* [1976] U.S.Code Cong. & Ad.News 335, 344.

7. U.S. Const. Art. II, § 2.

8. *See The Sentencing Options of Federal District Judges*, Chap. II, p. 4 (Fed. Judicial Center, June 1983 Revision).

service revolver from the marshal who was driving the automobile. This defendant kept butting his head against the driver's head in an apparent attempt to interfere with the operation of the vehicle. While this was occurring, the other prisoner raised his shackled feet over the back portion of the front seat and proceeded to kick at the head and shoulders of the other marshal who was riding in the passenger seat. Consequently, the marshals report that their vehicle went into a spin and crashed into a guard rail on Interstate 84 in Pennsylvania. The vehicle was severely damaged and had to be towed. One of the marshals sustained bruises to his head and some minor scratches and cuts, but neither of the prisoners was injured.

Because of this incident, charges of assault on a federal officer, escape and destruction of government property are pending in the United States District Court at Scranton, Pennsylvania. I have not considered these charges in arriving at the sentences imposed, but I now

ORDER that special security precautions be taken in the transportation and housing of this defendant during the pendency of the many charges which he faces in various parts of the country. I believe it is quite likely that this defendant would go on another violent crime spree if he ever did escape. Any temptation could trigger an attempt by him to escape. Even if he failed, the attempt itself could result in serious injury to other persons.

Finally, I designate the United States Penitentiary at Marion, Illinois as the initial place of confinement for the service of these sentences by this defendant. The U.S. Probation Office is directed to send a copy of this opinion and order to every court, state and federal, in which charges are presently pending against this defendant, to every prosecutor responsible for such pending charges, and to every sheriff, marshal, or other law enforcement officer who might be responsible for transporting or confining him, to the Director of the Bureau of Prisons and to the Chairman of the U.S. Parole Commission.