UNITED STATES of America

v.

Michael J. O'DRISCOLL

No. 4:CR–01–277.

United States District Court,
M.D. Pennsylvania.

Oct. 11, 2002.

Eric Pfisterer, James T. Clancy, Office of U.S. Attorney, Harrisburg, PA, for Plaintiff.

David A. Ruhnke, Ruhnke & Barrett, Montclaire, NJ, Micheal J. O'Driscoll, USP-Allenwood, White Deer, NY, Ronald C. Travis, Rieders Travis, Williamsport, PA, for Defendant.

### *SEALED OPINION*

MUIR, District Judge.

#### I. Introduction.

On April 26, 2002, the government filed a motion to have O'Driscoll placed in shackles and a stun belt during jury selection and trial. A hearing with respect to that motion was started on September 16, 2002, but because O'Driscoll with the consent of the government requested the hearing be closed, the September 16th hearing was aborted and continued at the request of United States Marshal Regan until October 7, 2002, because the necessary personnel could not be in attendance before that date. At the conclusion of the closed hearing on October 7, 2002, because jury drawing was scheduled to commence on October 8, 2002, we issued an interim oral order from the bench which granted the government's motion.[1] Furthermore, we stated the order would be effective only until a formal complete opinion including

---

1. On October 8, 2002, because of an unforeseen circumstance which had just occurred with respect to whether the government forfeited the right to seek the death penalty in this case jury selection was continued to October 23, 2002.

findings of fact, conclusions of law and a formal order were issued. Our decision in this matter is based on the evidence presented at the hearing, the undisputed findings of fact and the exhibits and documents contained in the record of this case. The following are the court's findings of fact, discussion and conclusions of law.

## II. Findings of Fact.

1. O'Driscoll is charged with first-degree, premeditated murder for which he faces the death penalty. (Undisputed, hereinafter "U") [2]

2. The indictment returned in this case on August 29, 2001, states in toto as follows:

On or about June 1, 1997, at the Allenwood Federal Correctional Complex, United States Penitentiary, in Union County, Pennsylvania, on land acquired for the exclusive use of the United States, under the exclusive jurisdiction of the United States and within the Middle District of Pennsylvania, the defendant,

### MICHAEL J. O'DRISCOLL

willfully, deliberately, maliciously, unlawfully, and with premeditation and malice aforethought, did kill Robert M. Frankhouser by stabbing him.

All in violation of Title 18, United States Code, Section 1111(a) and (b).

3. O'Driscoll currently is serving a sentence of 325 years with no possibility of parole for 99 years, effectively a life sentence. (U)

4. One of the crimes for which O'Driscoll currently is incarcerated is a kidnapping.

5. There are documents in the record which indicate that O'Driscoll murdered the individual he kidnapped.[3]

---

2. The parties submitted proposed findings of fact and designated those findings of fact as either disputed, undisputed or undisputed, but objected to. The government submitted unannotated supplemental proposed findings of fact and conclusions of law on October 9, 2002, as authorized by our oral order of October 8, 2002.

3. Judge Kane who sentenced O'Driscoll for kidnapping and armed bank robbery stated in his opinion relating to sentencing as follows:

Upon arriving in Salina, Kansas, the defendant dropped Tietjens off at a truck stop, advising her that he was going to take Mr. Martin [the kidnap victim] out and tie him up. After a lapse of some five or ten minutes, he returned to the truck stop, picked Tietjens up and they proceeded together to the vicinity of Cleveland, Ohio in Mr. Martin's car. While en route, the defendant told Tietjens that he had shot Mr. Martin in order to prevent him from identifying them. On January 23, 1983, two pheasant hunters found the frozen remains of Ken Martin. They duly reported their finding to the Saline County Sheriff's Office. Post-mortem examination established the Mr. Martin had been shot 10 times with a 9mm weapon and

had died of massive bleeding secondary to multiple gunshot wounds. The pathologist described one of the 10 bullet wounds as a "contact" wound, located in approximately the center of the chest.

On January 31, 1983, the defendant, using Kent Leslie Martin's car and the 9mm Smith & Wesson committed another armed robbery at the People's Savings Bank on South Street in Holyoke, Massachusetts. Mr. Martin's car was then abandoned in Groton, Connecticut where the police impounded it on February 8, 1983. An examination of the car revealed the right ring fingerprint of the defendant on the rear view mirror.

On September 23, 1983, officers of the Pierce County Sheriff's Office arrested the defendant in Tacoma, Washington. At the time of his arrest, he had the 9mm Smith & Wesson in his possession. Laboratory examination confirmed that this was the identical weapon which fired the five shell casings found at the scene of Mr. Martin's death.

[T]he evidence clearly showed [that] the defendant executed Kent Martin in a most cowardly fashion and, most tragically, for no intelligent reason at all.

6. There are documents in the record which indicate that one of the crimes for which O'Driscoll currently is incarcerated is an armed bank robbery during which he struck a pregnant woman in the abdomen.[4]

7. In sentencing O'Driscoll after [being found guilty] of kidnapping and armed bank robbery, the sentencing judge, in recognition of O'Driscoll's past violence, ordered "special security precautions to be taken in the transportation and housing of [O'Driscoll] during the pendency of the many charges which he faces in various parts of the country." (U)[5]

8. In sentencing O'Driscoll for the crimes of armed bank robbery and kidnapping, the sentencing judge also wrote, "I believe it is quite likely that [O'Driscoll] would go on another violent crime spree if he ever did escape. Any temptation could trigger an attempt by him to escape. Even if he failed, the attempt itself could result in serious injury to other persons." (U)

9. While being transported in 1984 by United States Marshals to stand trial in Colorado for the crimes of armed bank robbery and kidnapping, O'Driscoll violently attempted to escape.[6]

10. Exhibits submitted by the government reveal that when Deputy United States Marshals gained control of the situation after O'Driscoll's violent 1984 escape attempt actually in the Middle District of Pennsylvania, O'Driscoll stated, "What did you expect? I have nothing to lose. Go ahead and shoot me." See Document 191, Exhibits to Government's Reply Brief, Exhibit F, Incident Reports, attempted escape from United States Marshal's Service, January 1984.

11. O'Driscoll's expression of having "nothing to lose" occurred before he received his current sentence, before his indictment for first-degree murder, and before facing the possibility of a sentence of death. Id.

12. Virtually all of the alleged incidents during which physical harm was allegedly caused by O'Driscoll occurred in excess of fifteen (15) years ago. (U)

*United States v. O'Driscoll*, 586 F.Supp. 1486, 1488–89 & 1492 (D.Colo.1984).

**4.** Judge Kane in his opinion stated that during one of O'Driscoll's bank robberies that O'Driscoll "sharply elbowed a woman who was five months pregnant with such force that she doubled over." 586 F.Supp. at 1492.

**5.** Judge Kane stated in his opinion as follows: At the present time the defendant has seventy one charges in seven different courts pending against him. These charges include assault on a federal officer, escape, murder, assault with dangerous weapons, armed robbery, malicious injury, assault with intent to rape and threat to murder. In addition, there are eight pending charges of kidnapping.
586 F.Supp. at 1492.

**6.** Judge Kane in his opinion stated as follows: On January 5, 1984, this defendant and another federal prisoner were being transported via automobile by two U.S. Marshals. Both prisoners were in handcuffs attached to waist chains, and both were in leg irons, seated in the rear of the vehicle. Despite these precautions, the U.S. Marshal Service reports that at approximately 2:25 p.m., both prisoners let out a scream. Then, this defendant lunged over the front seat and attempted forcibly to remove the service revolver from the marshal who was driving the automobile. This defendant kept butting his head against the driver's head in an apparent attempt to interfere with the operation of the vehicle. While this was occurring, the other prisoner raised his shackled feet over the back portion of the front seat and proceeded to kick at the head and shoulders of the other marshal who was riding in the passenger seat. Consequently, the marshals report that their vehicle went into a spin and crashed into a guard rail on Interstate 84 in Pennsylvania.

13. Up through May 31, 1997, O'Driscoll's central inmate file is devoid of any incident reports where O'Driscoll allegedly caused physical harm to staff or another inmate. (Undisputed, but objected to, hereinafter "UO") [7]

14. After June 1, 1997, the date of the alleged murder, O'Driscoll's inmate file is devoid of any incidents where it is contended O'Driscoll caused physical harm to any staff or other inmates.

15. O'Driscoll was in the custody of former Warden Jake Mendez at the United States Penitentiary at Allenwood for two and a half years.(U)

16. In former Warden Mendez's opinion, O'Driscoll was one of the most dangerous inmates he ever had in his custody at Allenwood or any other penitentiary. (UO) [8]

17. Previously documents were submitted by the government with respect to a motion which reveal that O'Driscoll may have been involved in an escape attempt from the United States Penitentiary at Leavenworth on November 9, 1991. O'Driscoll was reported by one Confidential Informant ("C.I.") as wanting to go borrow money to buy hacksaw blades and as being present when one bar to a cell was cut. Another C.I. identified the defendant as one of the lookouts for the bar cutting. See Doc. 177, sealed order dated July 8, 2002.

18. Previously documents were submitted by the government with respect to a motion which reveal that O'Driscoll may have been involved in an escape plot from the United States Penitentiary, Lewisburg, Pennsylvania, on April 19, 1995. O'Driscoll was identified by a confidential informant as participating with other inmates in an escape attempt which involved the use of a hacksaw bláde. A search of O'Driscoll's cell disclosed a hacksaw blade recovered from O'Driscoll's wall locker. Id.

19. Previously documents were submitted by the government with respect to a motion which reveal that O'Driscoll may have possessed escape paraphernalia at the United States Penitentiary, Lewisburg, Pennsylvania, on July 26, 1996. On July 26, 1996, a routine shakedown of the A-block recreation area disclosed a homemade braided rope 21 feet in length with metal clip attached, an oversized green raincoat camouflaged with paint and grass and a hood with eye sockets cut out. Further investigation resulted in the search of O'Driscoll's cell where human hair was found wrapped in a folded paper towel in the trash can. Additionally, two containers of different shades of green paint were found hidden in O'Driscoll's cell. This paint matched the paint found on the camouflaged raincoat. Id.

20. On October 14, 1998, prison staff conducted a routine shakedown of the cells in the Special Housing Unit at USP–Allenwood. During this shakedown staff found a shank in O'Driscoll's cell.

21. On April 30, 2001, while incarcerated at the maximum security United States Penitentiary at Allenwood, Pennsylvania, O'Driscoll refused orders to cuff up and leave a recreation cage, necessitating the employment of a use-of-force team to extract him from the recreation cage. (U)

22. The government presented in evidence a videotape which shows that on April 30, 2001, O'Driscoll was in a recreation pen at the Allenwood United States

---

**7.** By including this finding of fact in our opinion we are overruling the government's objection.

**8.** By including this finding of fact in our opinion we are overruling O'Driscoll's objection.

Penitentiary. O'Driscoll refused to cuff-up and return to his cell when ordered to do so by correctional staff. A use-of-force team was assembled, entered the recreation pen, subdued O'Driscoll and carried him to his cell. As the team entered the recreation pen O'Driscoll charged and resisted the team. The videotape shows that given the opportunity O'Driscoll would assault correctional staff.

23. On April 9, 2002, O'Driscoll again refused to leave a recreation cage necessitating the employment of a use-of-force team to extract him from the recreation cage.

24. The government presented in evidence a videotape which shows that on April 9, 2002, O'Driscoll was in a recreation pen at the Allenwood United States Penitentiary. O'Driscoll refused to cuff-up and return to his cell when ordered to do so by correctional staff. A use-of-force team was assembled, entered the recreation pen, subdued O'Driscoll and carried him to his cell. As the team entered the recreation pen O'Driscoll resisted the team. The videotape shows that O'Driscoll poses a danger to the safety of correctional staff.

25. On September 16, 2002, O'Driscoll was transported from USP–Allenwood to the United States Courthouse in Williamsport, Pennsylvania. (U)

26. The transportation Order issued by the court for that transportation authorized the United States Marshal to use whatever security measures he deemed appropriate.

27. Although authorized to affix a stun belt to O'Driscoll for the transportation, the U.S. Marshal's Service did not do so. (U)

28. On September 16, 2002, O'Driscoll appeared in court for a hearing in handcuffs and shackles.

29. During the proceeding O'Driscoll was handcuffed and also shackled to the floor of the courtroom.

30. During jury selection and trial O'Driscoll will not be handcuffed.

31. Pursuant to the United States Marshals Service policy, United States Marshal Michael Regan has conducted an assessment of O'Driscoll's security and escape risk.

32. Considering O'Driscoll's current charge and potential sentence, his attempted escape from Marshals custody in 1984 in this district and his comments to Deputy U.S. Marshals at that time, Marshal Regan concludes that O'Driscoll is extremely dangerous, poses a significant threat to trial participants, and is a significant escape risk.

33. Based on his conclusion, Marshal Regan believes it is necessary and strongly recommends that O'Driscoll wear a stun belt and shackles that are bolted to the courtroom floor during his upcoming trial in order to maintain the security of the courtroom. (U)

34. Marshal Regan has considered whether shackles bolted to the courtroom floor alone would be effective in maintaining safety in the courtroom in this case. (U)

35. If the defendant were restrained in leg shackles bolted to the courtroom floor, his movement in the courtroom would be restricted. (U)

36. If the defendant was restrained in leg shackles bolted to the courtroom floor, those individuals closest to the defendant during his trial, his counsel, would be at greatest risk of injury if he were to have a violent outburst at the defense table. (U)

37. Defendant's counsel have indicated to the court that they have no fear for

their safety in the defendant's presence. (U)

38. There have been at least two instances where defendants appearing before judges in the Middle District of Pennsylvania have attacked their counsel.[9]

39. Leg shackles alone would not prevent O'Driscoll from having a violent outburst at counsel's table.

40. In the event of such an outburst, the added measure of the stun belt would help Deputy Marshals subdue O'Driscoll before significant injury were suffered by his counsel and others within his reach.

41. In making his decision strongly to recommend the use of a stun belt along with shackles bolted to the courtroom floor, Marshal Regan considered other alternatives to address the substantial security concerns he has in this case.

42. Marshal Regan is of the opinion that substantially increasing the number of Deputy U.S. Marshals in the courtroom to address the security concerns in this matter would be less satisfactory than the use of a stun belt and shackles as such an increased police presence in the courtroom may result in prejudice to the defendant if observed negatively by the jury. (U)

43. Marshal Regan believes that, if there is a violent episode during the trial, the use of physical force by Deputy U.S. Marshals may result in more serious phys-

ical injury to the defendant or the Deputy U.S. Marshals than the use of the stun belt. (U)

44. The stun belt will not be visible to the jury because it will be worn under O'Driscoll's clothing.

45. Stun belts are a non-lethal means to guard against escape by prisoners and detainees and to ensure courtroom safety.

46. The type of stun belt used by the Marshals Service and at issue in this case was manufactured by Stun Tech, Inc., and is known as the Remote Electronically Activated Control Technology ("R–E–A–C–T") Belt. (U)

47. The R–E–A–C–T Belt consists of a four-inch wide elastic band that wraps around the wearer's waist and is secured by a velcro fastener. (U)

48. The R–E–A–C–T belt is a remotely activated device. (U)

49. As a result of the belt's design and method of activation, it can be used in the courtroom without disclosure that O'Driscoll is under restraint.

50. The R–E–A–C–T belt is powered by two nine-volt batteries connected to metal tabs that rest against the wearer's back when the belt is cinched. (U)

51. When activated, the belt delivers an eight-second, 50,000 volt shock that is

9. Michael Leggett appeared before the undersigned with his attorney G. Scott Gardner for sentencing on March 25, 1996. Attorney Gardner approached the bar of the Court for the sentencing hearing. Leggett followed after a momentary delay. He initially began to walk approximately 25 feet to his position next to his attorney, but over the last several feet he began running, threw his legal papers to the floor, and struck Attorney Gardner on the right side of his face. Both men fell to the floor and a scuffle ensued. Leggett was restrained by Deputy Marshals and a Probation Officer.

In May of 1994 Eddie Jennings appeared before Judge McClure with respect to a motion to substitute counsel. During that proceeding "Jennings hit his counsel in the side of the head with his closed fist, causing counsel to reel to the courtroom floor. The blow caused swelling and redness on the cheek and just below the left ear of counsel. Six Marshals were required to restrain defendant...." *United States v. Jennings*, 855 F.Supp. 1427, 1432 (M.D.Pa.1994) (McClure, J.).

designed to immobilize the wearer temporarily. (U)

52. The shock delivered by the R–E–A–C–T belt is not lethal.

53. The shock delivered by the R–E–A–C–T belt would not cause cardiac injury even to one with known heart disease.

54. United States Marshals Service and United States Bureau of Prisons policies restricting use of the R–E–A–C–T belt on individuals with heart disease is probably more restrictive than necessary given the safety of the R–E–A–C–T belt.

55. No evidence was presented at the hearing that activation of the R–E–A–C–T belt has ever resulted in involuntary defecation or enuresis.

56. The amperage delivered when the belt is activated is 4.1 milliamps.

57. 4.1 milliamps is about the same amount of amperage required to light a small Christmas tree bulb.

58. The stun belt is not productive of injuries to human beings other than injuries possibly associated with a fall following the belt's activation.

59. During training exercises, R–E–A–C–T belts have been activated on over 8000 officers and volunteers.

60. None of these officers and volunteers have been injured or claimed injury from the belt's activation.

61. The shock delivered by the R–E–A–C–T belt acts only on the voluntary muscles of the body, and does not affect respiration or the heart.[10]

62. Since 1993, Stun Tech, Inc., has sold approximately 1758 R–E–A–C–T belts nationwide. (U)

63. The stun belt can be accidentally activated. (U)

64. Stun belts have been worn on detainees and prisoners over 63,000 times.

65. Of those more than 63,000 separate uses, the belts have only been reported activated 45 times.

66. Of those 45 known activations 34 were activations intended by the officer and 11 were accidental officer activations.

67. The numbers set forth in the last preceding paragraph reflect an accidental activation rate of less than 175 ten thousands of one percent.

68. The United States Marshals Service has a record of only two instances of unintended activation of the R–E–A–C–T belt.

69. The first instance of unintentional activation of a stun belt by the Marshals Service involved a belt used at a training session in the Middle District of Georgia.

70. The belt was returned to the manufacturer.

71. The manufacturer determined that there was a short in the unit.

72. As a result of that discovery, a modification was made by the manufacturer to the construction of the device to prevent such a malfunction.

73. The second instance of unintentional activation of the stun belt by the Marshals Service involved a belt on a federal detainee in the Middle District of Georgia.

74. The belt was returned to the manufacturer.

75. The manufacturer determined that the activation was caused by a loose connection of unknown origin not warranting a modification to the design or manufacture of the belt.

76. Seven of the 11 known accidental activations occurred prior to August 1995,

---

**10.** The human heart is an involuntary muscle.

at which time the R–E–A–C–T belt's transmitter was redesigned to include a plastic guard over the toggle activator switch which necessitates the officer purposefully placing his finger under the guard and depressing the activator switch.

77. The plastic guard substantially decreases the possibility of a belt being accidentally activated by an officer unknowingly brushing against an object and depressing the activator switch.

78. The belts used by the United States Marshals Service in this District are equipped with the plastic trigger guard.

79. The chance of a R–E–A–C–T belt being unintentionally activated by an interfering radio signal is de minimis.

80. The manufacturer of the R–E–A–C–T belt knows of no unintentional activation of a belt by radio signals or outside interference.

81. No stun belt used by the United States Marshals Service in this District has ever been activated by an interfering unwanted radio signal or by any technical malfunction.

82. The United States Marshals Service's use of stun belts is governed by a January 29, 1999, policy statement. (U)

83. That policy states that a prisoner or detainee may be made to wear a stun belt if he or she poses "a substantial escape risk or risk of injury or death to the deputy or others." (U)

84. Further, according to that policy a stun belt may only be activated by a Deputy Marshal after a precise and deliberate action by the wearer of the belt. (UO)[11]

85. Specifically, a stun belt may only be activated if the prisoner or detainee:

(1) tampers with the belt; (2) fails to comply with a Deputy Marshal's oral orders to halt movement; (3) attempts to escape custody; (4) takes any action which indicates that he or she is attempting to inflict bodily harm to another person; or (5) intentionally attempts to avoid constant visual contact by the Deputy.

86. Further, according to the policy prior to applying a stun belt the Deputy Marshal will advise the defendant that the belt will be activated only in these five circumstances. (UO)[12]

87. In the notification which will be read to O'Driscoll, and which he will be given to read, O'Driscoll will be advised that the belt discharges fifty thousand volts of electricity which can be activated by a Deputy Marshal.

88. O'Driscoll will be advised that if activated he would become immobilized and fall to the floor or ground and that there is the possibility of involuntary urination or defecation.

89. Pursuant to the United States Marshals Service policy, each Deputy Marshal who will operate a stun belt during this trial has successfully completed a training program by certified training instructors regarding the use of this device.

90. Deputy Marshals are instructed that, if possible, they should attempt lesser measures prior to activation of a stun belt.

91. Each stun belt is equipped with a warning device that can be used to warn the wearer with an audible tone prior to the belt's activation. (U)

92. On July 19, 2002, the government filed various exhibits in support of its motion to use a stun belt and shackles in the upcoming trial, including a Declaration of

---

**11.** By including this finding of fact in our opinion we are overruling O'Driscoll's objection.

**12.** Id.

United States Marshal Michael R. Regan, dated July 19, 2002.

93. A stun belt may be used only if medically appropriate according to Paragraph 14 of the Declaration of U.S. Marshal Regan. (U)

94. According to the literature which has been submitted, one of the health reasons precluding the use of a stun belt is if the individual has heart disease. (U)

95. The written policy of the United States Marshal's Service concerning stun belt usage directs that the stun belt not be used on prisoners known to have heart disease, multiple sclerosis, muscular dystrophy, or epilepsy; or any other medical condition known to pose a risk to the prisoner. (U) [13]

96. Before a stun belt is applied, Marshals Service policy requires that all reasonable measures be taken to ensure that the prisoner or detainee has no existing medical condition that would preclude use of the device. (U)

97. Included in O'Driscoll's Central Inmate File, medical section, is a printout of an EKG which was read as abnormal. (U)

98. The EKG printout from July 7, 1999, indicates "Reversed R wave Progression V2–V4" and "POSSIBLE OLD ANTERIOR INFARCTION." (U)

99. There is no cardiologist on staff at USP–Allenwood. (U)

100. O'Driscoll's medical records were reviewed by Ronald Laino, a physician's assistant.

101. Mr. Laino determined that O'Driscoll does not have any medical condition that would preclude the use of a stun belt.

102. In January of 2000, O'Driscoll had a consultation with a cardiologist because of complaints of chest pains.

103. O'Driscoll's chest pains consisted of two episodes of pain lasting approximately one minute. (U)

104. The cardiologist who examined O'Driscoll found that his pain was highly atypical not warranting further evaluation.

105. The cardiologist recommended that a stress test be conducted when the defendant attained the age of 50.

106. O'Driscoll's medical records indicate no complaints of chest pain of any kind following his experience of chest pain in 1999.

107. O'Driscoll has made no complaints of chest pain since the January 2000 examination.

108. O'Driscoll made no complaints of chest pain following either of the two incidents in which use-of-force teams were required to extract him from recreation cells at the United States Penitentiary at Allenwood.

109. There is nothing in O'Driscoll's prison medical records to indicate that any medical testing is necessary before clearing O'Driscoll medically to wear a stun belt.

110. O'Driscoll's cholesterol levels are very good.

111. The two entries in one lab report of one blood test of O'Driscoll's under a column headed "abnormal" have nothing to do with O'Driscoll's risk of heart disease.

112. The most likely reason for O'Driscoll's "abnormal" EKG in July of 1999 is faulty placement of the leads when the test was administered.

---

**13.** See Doc. 191, Exhibits to Reply Brief in Support of United States' Motion to Have the Defendant Placed in Shackles and Stun Belt During Trial, Exhibit E, United States Marshals Service Policy No. 99–09.

113. There is no evidence in the record from which it can be concluded that O'Driscoll suffers from heart disease.

114. The risk to O'Driscoll by an activation of the stun belt is no greater than the risk to the average individual.

115. O'Driscoll has no pre-existing medical conditions that would preclude the use of a stun belt.

116. The record is devoid of any evidence to suggest that O'Driscoll would be in such fear of wearing a stun belt that he would be unable effectively to participate in his defense.

117. In the event that the R–E–A–C–T belt is activated there is no danger to anyone who may come in contact with the wearer upon activation of the belt.

118. Under standard practice, inmates appearing for jury trial are not in leg shackles. (U)

119. Under the Government's proposal for shackles, O'Driscoll would enter and leave the courtroom in shackles. (U)

120. Under the Government's proposal the leg shackles would remain on O'Driscoll and be affixed in some manner to a bolt in the floor while court is in session. (U)

121. Under the Government's proposal once O'Driscoll arrived at counsel table, additional time will be needed in order to secure the shackles to the floor bolt. (U)

122. During any court recesses the shackles would have to be unhooked or otherwise disconnected from the floor bolt for O'Driscoll to be removed from the courtroom. (U)

123. Counsel for O'Driscoll have no fear of sitting at counsel's table with the shackles or stun belt not being affixed to O'Driscoll.(U)

124. Courtroom # 1 which will be used for this trial has been equipped with a system by which a defendant can be shackled to the floor of the courtroom.

125. Counsel tables have been modified by the placement of wooden panels around the bases of the tables so that shackles on O'Driscoll will not be visible to the 12 jurors and 6 alternate jurors.

126. The United States Marshal has repositioned defense counsel tables so that during jury selection the potential jurors seated in the courtroom will not be able to view the shackles.

127. The United States Marshal has wrapped the shackles with a material that will significantly reduce any noise made by O'Driscoll moving his feet under the counsel table.

128. O'Driscoll in this case presents an extraordinary security risk.

### III. Discussion.

 The use of shackles during a criminal proceeding is permissible upon a showing of "extreme need." *Fountain v. United States*, 211 F.3d 429, 436 (7th Cir. 2000). "Extreme need" has been defined as "necessary to maintain the security of the courtroom." *Id.* Also, it has been held that "[s]hackling is proper where there is a serious threat of escape or danger to those in and around the courtroom, or where disruption in the courtroom is likely if the defendant is not restrained." *Hamilton v. Vasquez*, 882 F.2d 1469, 1471 (9th Cir.1989). Before extraordinary security measures are authorized by the court the government must demonstrate that the circumstances of the case call for such measures and that less restrictive security measures would not be adequate. See *United States v. Durham*, 287 F.3d 1297 (11th Cir.2002).

With regard to the use of a stun belt as a security measure, in *Durham* the Court of Appeals for the 11th Circuit reversed a

conviction because of such use. *United States v. Durham*, 287 F.3d 1297 (11th Cir.2002). The *Durham* decision focussed on the failure of the district court to make sufficient findings of fact justifying the use of a stun belt during trial. In our opinion the findings of fact justify the imposition of the extraordinary security measures requested by the United States Marshal. The government has demonstrated to our satisfaction that the security measures requested are clearly justified by the circumstances and less restrictive security measures would not be adequate. The government has also established that O'Driscoll does not have a medical condition that precludes the use of a stun belt.

In light of our findings of fact set forth in part II of this opinion it is clear that O'Driscoll poses an extreme security risk. He is a serious escape risk as well as a threat to the safety of court personnel and other persons. Therefore, we will authorize the use of a stun belt and shackles during jury selection and trial.

### IV. Conclusions of Law.

1. The court is responsible for the security of the courtroom, and it decides, first, whether any special security is needed, and second, on the most appropriate security safeguards under the particular circumstances. (U)

2. In light of O'Driscoll's history of violence and escape attempts, the use of a stun belt and shackles during jury selection and trial is warranted.

3. Use of a stun belt and shackles as a security device at jury selection and trial will not impose a substantial burden upon O'Driscoll's constitutional rights.

An appropriate order will be entered.

### *SEALED ORDER*

The government's motion to have the defendant placed in shackles and stun belt during jury selection and trial (Doc. 116) is granted.